Cause No. 067 248661 10

| | | |
|---|---|---|
| TODD A. MEAGHER and MARILYN D. GARNER, TRUSTEE FOR THE BANKRUPTCY ESTATE OF TODD ENTERTAINMENT, LCC | : : : : : | IN THE DISTRICT COURT OF |
| Plaintiffs, | : : | |
| vs. | : : | TARRANT COUNTY, TEXAS |
| ANDREW GOODFRIEND, an individual & THE AGENCY GROUP, LTD., a California Corporation | : : : : : | |
| Defendants | : | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF THE DISTRICT COURT:

Todd A. Meagher and Marilyn D. Garner, Trustee to the Bankruptcy Estate of Todd Entertainment, LLC, Plaintiffs, file this original petition against Andrew Goodfriend and The Agency Group, Defendants, and respectfully show the following in support:

### I.   DISCOVERY CONTROL PLAN

1. Plaintiffs plead that discovery in this case should be conducted under Level 2 as set forth in TEX. R. CIV. P. 190.3.

### II.   PARTIES

2. Plaintiff Todd Meagher (referred to herein as "Meagher" and/or "Plaintiff"), is an individual who resides in Tarrant County, Texas, with Texas Driver's License Number xxxxx548.

A CERTIFIED COPY
ATTEST: *December 2, 2010*
THOMAS A. WILDER
DISTRICT CLERK
TARRANT COUNTY, TEXAS
BY: _____
DEPUTY

FILED TARRANT COUNTY
THOMAS A. WILDER
DISTRICT CLERK
2010 OCT -7 PM 3:58

PLAINTIFFS' ORIGINAL PETITION
- 1 -

3. Plaintiff Marilyn D. Garner is the duly appointed, qualified, and acting trustee of the estate of Todd Entertainment, LLC, a limited liability company organized under the laws of the States of California and Nevada, with its principal office in Keller, Texas.

4. Defendant Andrew Goodfriend ("Goodfriend") is an individual who is a non-resident of Texas, who resides in the State of New York, who has had minimum contacts with Texas, and may be served with process at his residence, 11 Tippet Way, Pittsford, NY 14534.

5. Defendant The Agency Group, Ltd. ("TAG") is a foreign corporation organized and existing under the laws of the State of California, is authorized to do business in Texas, and may be served with process by serving its California registered agent for service of process, Andy Sommers, at 1880 Century Park East, Suite 711, Los Angeles, California 90067.

### III. STATUTORY AUTHORITY

6. This suit is brought, in part, pursuant to TEX. BUS. & COM. CODE § 17.41 et. seq., commonly known as the Deceptive Trade Practices and Consumer Protection Act, and cited in this petition as the "DTPA;"

### IV. JURISDICTION

7. The Court has jurisdiction over Defendants (who are non-residents) because (a) the Texas long-arm statute authorizes the exercise of jurisdiction over the Defendants, and (b) the exercise of jurisdiction in this case is consistent with constitutional due-process guarantees.

8. The Texas long-arm statute authorizes service of process on nonresidents "[i]n an action arising from the non-resident's business in the state." TEX. CIV. PRAC. & REM. CODE ANN. § 17.043. A non-resident "does business" in Texas if it "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state"; or "commits a tort in whole or in part in this state." Id. § 17.042. In this case, both circumstances

apply. As described more fully below, in June, 2003, Defendants began working with Plaintiffs as their "exclusive talent agents." At the time, Plaintiff Todd Meagher resided in Alameda, California, and the offices of Todd Entertainment, LLC were located in San Francisco, California. However, in May, 2004, Meagher purchased a home and moved to Keller, Texas, and began running Todd Entertainment, LLC out of his Texas residence. Subsequent to the move, Defendants continued to represent Plaintiffs as their exclusive talent agents, procuring and commissioning numerous engagements for Plaintiffs' artist Josh Todd. The deceptive trade practices and tortious acts complained of herein arise in whole or in part out of that series of transactions, and more specifically, out of a series of engagements procured by the Defendants, and on Plaintiffs' behalf, between May 1, 2004 and September 26, 2004.

9. The exercise of jurisdiction in this case is consistent with constitutional due-process guarantees because the Defendants have established the requisite minimum contacts with the state of Texas. Upon information and belief, Defendants have represented scores of Texas artists, and have solicited, procured and contracted hundreds (if not thousands) of live engagements at venues across the state (including several engagements for Plaintiffs). In addition, the deceptive trade practices and tortious acts complained of herein arose out of, or were related to, a series of engagements procured while Plaintiffs were residents of this state.

## V.   VENUE

10. Venue in this action is proper in the county of suit because all or a substantial portion of the events or omissions giving rise to this suit arose in this county, and because the Defendants solicited the transactions upon which this lawsuit is based in the county of suit. TEX. CIV. PRAC. & REM CODE § 15.002; DTPA 17.56(2).

## VI. FACTUAL BACKGROUND

11. Meagher is a successful musician, songwriter, and internet entrepreneur with over twenty years' experience in the music business. In or around June of 2003, he formed an entertainment company with Josh Todd – an out-of-work singer who had enjoyed a bumpy career from 1995 through 2002 as the front-man for the musical group *Buckcherry*. On or about June 23, 2003, Todd and Meagher entered into a written operating agreement forming Todd Entertainment, LLC (the "LLC"), the purpose of which was to employ the exclusive personal services of Josh Todd as a songwriter, recording artist and musical performer. Under the operating agreement, Todd and Meagher each retained a 50% membership interest in the LLC. Meagher contributed all of the LLC's start-up capital ($218,000 per the written agreement, although Meagher's contributions eventually ballooned to over $600,000). In return, Todd contributed his services and various intellectual property rights.

12. At around the same time that Meagher and Josh Todd were negotiating the operating agreement, Meagher began soliciting talent agents to represent the company. He eventually met with TAG, where he was introduced to one of its aspiring young agents, Andrew Goodfriend. Goodfriend assured Meagher that he was committed to the proposed project, and that he and TAG were capable of fulfilling all of the LLC's talent agency needs. Based upon those promises, the LLC retained TAG is its talent agency, with Goodfriend acting as the LLC's "responsible agent."

### The Japan Show

13. Shortly after the LLC hired Goodfriend, Josh Todd expressed a desire to take his band to Japan. Todd's former band *Buckcherry* had been popular in that country, and the LLC was in the process of negotiating a distribution deal for Japan, so that a performance there

appeared as if it would be both lucrative and timely. When Meagher approached Goodfriend about it, Goodfriend confessed that he "didn't know anybody" in Japan, and asked Meagher to reach out to any Japanese contacts that he or Josh Todd had in order to solicit interest. In response, Meagher made some inquiries, and eventually left a phone message with a promoter named "Udo Artists, Inc." with whom *Buckcherry* had previously worked.

14. Several days later, on June 26, 2003, Meagher received an e-mail from Mr. Udo's assistant, Kei Ikuta, advising Meagher that he would pass along any "comments/requests" that Meagher might have. Meagher replied that Josh Todd was "looking to come to Japan to promote [his] new record," and asked the promoter to contact him if he was interested. Meagher then conveyed this information to Goodfriend, and asked him to follow-up with Udo Artists. On July 8, 2003, Meagher sent another e-mail to Goodfriend asking him "[d]id you follow up on Udo in Japan?" On August 1, 2003, Meagher again followed-up with Goodfriend via e-mail. For the next few months, nothing happened. Then, on March 9, 2004, Meagher received an offer directly from Udo Artists, proposing that Josh Todd perform at an open air festival called the "Rock Odyssey" for $100,000. Meagher forwarded the offer to Goodfriend, who confirmed the show the very same day. Over the next few months, Meagher and Goodfriend worked together to iron out details, including the handling of tax payments, artist line-up, travel costs, and related issues. Goodfriend and TAG eventually earned a commission of $10,000 for their efforts.

**Goodfriend Requests More Assistance**

15. Unfortunately, Goodfriend's disappointing lack of promoter contacts was not limited to Japan. Although he promised Meagher and the LLC that he had the wherewithal to keep Josh Todd busy, the fact is that he was an inexperienced agent with few connections and a poor work ethic. One of the first persons to recognize this was Ed Phillips, President of XS

Records – the U.S. Distributor for Josh Todd's first solo album, "You Made Me." Phillips, who invested tens of thousands of his own dollars into manufacturing and distributing the album, discovered gaping holes in Todd's tour itineraries – tours which were absolutely critical to XS Records' marketing plans. When Phillips confronted Goodfriend about these problems, Goodfriend confessed that he lacked contacts in several key cities, and asked Phillips to help him plug the holes. As an apparent *quid pro quo*, Goodfriend agreed to book some of Phillips' other young acts – some of which were "piggy-backed" onto Josh Todd's engagements without any authorization from Meagher or the LLC.

16. Throughout the spring and summer of 2004, Goodfiend and Phillips worked closely together. During that period, Phillips routinely brought performance opportunities to Goodfriend – some of them fully negotiated, some of them not. Goodfriend thereafter contracted the engagements and commissioned the shows as if he had done all of the work, without informing the LLC or Meagher of the circumstances. At the end of the day, Plaintiff estimates that the LLC paid tens of thousands of dollars in commissions to Goodfriend for shows that simply fell into his lap, and as set forth below, Goodfriend has confessed as much. But that is just the tip of the iceberg.

**The "Set-up"**

17. In September 2004, seeking greener pastures and an escape from his contractual obligations to the LLC, Josh Todd contrived a dispute with Meagher and the LLC and abandoned his duties.[1] Shortly thereafter, he re-formed his old band *Buckcherry*, and signed with a new label, publisher and manager. Not coincidentally, Goodfriend – who had recently departed The Agency Group to form his own agency - became *Buckcherry's* new agent.

---

[1] Among these "disputes" was the claim that Meagher failed to file taxes which weren't even due yet.

18. Unsurprisingly, litigation commenced in the fall of 2004, and is still ongoing. In the interim, Josh Todd has utilized a phalanx of attorneys and a robust war chest to keep Meagher and the LLC at bay. These "Rambo" litigation tactics have allowed Todd to divert, conceal and/or waste millions of dollars in earnings that rightfully belong to the LLC. As a result, Meagher and the LLC have been forced to file for bankruptcy protection.

19. The latest development in this long and tortured journey occurred in October, 2008, when Josh Todd instigated a phony action before the California Labor Commission ("CLC") to have the LLC operating agreement declared void. In this latest ploy, Todd has obtained the willing assistance of the LLC's former agent - Defendant Goodfriend. Together, they hope to finally put a fork into Meagher and the LLC.

**The End Game**

20. Under California law, the CLC is authorized to void *ab initio* any contract under which an unlicensed person "procures" employment for an artist. The law is intended to protect artists from the unscrupulous actions of those who might do them harm, but it has been harshly criticized as overused and overreaching. While it may seem odd to this honorable Court, California law construes virtually *any* communication with a promoter or talent buyer as "procurement" – no matter how benign. Accordingly, the simple act of contacting a promoter can lead to the avoidance of a contract having nothing to do with talent agent services (such as a management contract, or, in this case, an LLC operating agreement). Notwithstanding, California law recognizes a "safe harbor" which, if correctly applied, would clearly moot the CLC action against Meagher and the LLC. Under the California Talent Agencies Act,[2] a person is allowed to "act in conjunction with, and at the request of, a licensed talent agency in the

---

[2] California Labor Code § 1700, et. seq.

negotiation of an employment contract."[3] In other words, so long as a licensed talent agent is involved, the Act presumes that no harm will come to the artist. The rule makes perfect sense and is, of course, exactly what happened in this case. However, in a blatantly transparent effort to assist his current client while spurning his prior, Goodfriend has intentionally provided perjured testimony in the CLC case – specifically aimed at eviscerating the safe harbor defense.

**The Perjured Declaration**

21. Although Meagher was involved in only *one* show (the Japan show) out of hundreds of others that were booked and commissioned by Goodfriend and TAG; and although Goodfriend *specifically* asked Meagher to help procure that particular date, Goodfriend has sworn-out a declaration in the CLC action which avers the following: (1) that he "became aware of instances in which Meagher and [the LLC] initiated contacts so as to procure live performances for [Josh Todd] with third parties at various venues," and (2) that "neither [he] nor [TAG] requested that Meagher or Todd Entertainment procure those particular engagements."[4] In support, Goodfriend identifies the Japan show (for which he specifically requested Meagher's assistance), and 8 other engagements that appear to have been procured through the assistance of Plaintiffs' distributor, Ed Phillips (again, at Goodfriend's request). And while Goodfriend and TAG were only too happy to commission all of those engagements (earning tens of thousands of dollars), Goodfriend swears that "[n]either [he] nor [TAG} solicited, procured or negotiated *any* of [them]" (emphasis added).

22. Goodfriend's declaration is false, and aimed at gutting the LLC's valuable rights – including the pending lawsuit against Josh Todd. If he succeeds, Meagher and the LLC will

---

[3] *Id.*, § 1700.44(d).

[4] *See* Goodfriend Declaration dated October 7, 2008, attached hereto as Exhibit "A."

forfeit millions of dollars in assets – including valuable intellectual property rights and contractual rights related to Josh Todd's lucrative career which are presently estimated to be worth at least $20 million. Indeed, Josh Todd has confirmed in court pleadings that this is his precise objective.

**Summary**

23. At the end of the day, the Defendants have knowingly engaged in deceptive and unconscionable behavior, in blatant violation of their fiduciary duties and various Texas consumer laws. As set forth above, Goodfriend intentionally lured Meagher into performing unlicensed talent agent services, and then hung his client out to dry. He has persisted in this deceptive and unconscionable conduct by providing perjured testimony at the California Labor Commission in a shameful effort to benefit himself and his new client *Buckcherry*. Finally, his hubris has been his undoing, as he has admitted in sworn testimony that he and TAG pilfered commissions from the LLC while others did their work.

24. Plaintiffs now bring this suit.

## VII. CAUSES OF ACTION

### COUNT 1:
### BREACH OF IMPLIED WARRANTIES

25. By the conduct described above, Defendants have breached the implied warranty of good and workmanlike services, actionable under DTPA § 17.50(a)(2).

### COUNT 2:
### FALSE REPRESENTATIONS / DTPA

26. Defendants misrepresented the characteristics, uses, benefits, standard and quality of their services by stating and/or implying the following: (a) that it was in Plaintiffs' interests to work "in conjunction with" Andrew Goodfriend, and that by doing so, they would not be

violating any laws, (b) that Defendants would only commission engagements that they in fact "procured," (c) that Defendants *did* procure the engagements in question, (d) that Defendants did *not* procure the engagements in question, (e) that Goodfriend desired for Plaintiffs to assist him in the procurement of the engagements in question, and/or (f) that neither Goodfriend nor TAG "requested" that Plaintiffs and/or Phillips assist Goodfriend in procuring the engagements in question. One or more of these representations were false, misleading and deceptive as defined under DTPA § 17.50(a)(1).

## COUNT 3:
### UNCONSCIONABILITY / DTPA

27. Defendants took advantage of Plaintiffs' lack of knowledge, ability, experience or capacity to a grossly unfair degree, by, *inter alia*, (a) failing to disclose to Plaintiffs the relevant provisions of the Act, and the pitfalls inherent in assisting Goodfriend in performing his tasks as Plaintiffs' licensed talent agent, (b) failing to stipulate the limitations, if any, of the authority conveyed to Plaintiffs and/or Phillips, and (c) providing false testimony before the CLC. For these reasons (among others), the transaction(s) in question was/were unconscionable and is/are actionable under DTPA § 17.50(a)(3).

## COUNT 4:
### NEGLIGENCE

28. By engaging in the acts described above, Defendants have negligently exposed Plaintiffs to liability under the California Talent Agencies Act.

## COUNT 5:
### BREACH OF FIDUCIARY DUTY

29. Defendants owed Plaintiffs a special duty because they acted as Plaintiffs' agent in connection with the procurement of engagements for Plaintiffs; because they were granted

"power of attorney" to execute documents on Plaintiffs' behalf, and because there was a special relationship of trust and confidence between the parties.

30. Defendants breached their fiduciary duties by, *inter alia*, (a) misrepresenting the extent to which they negotiated and/or procured various engagements on Plaintiffs' behalf, (b) commissioning engagements that they now claim never to have procured, (c) asking Plaintiffs to help procure engagements, and later exploiting that circumstance in an effort to aid and abet a current client, (d) providing false testimony against Plaintiffs, (e) cutting a "side-deal" with Plaintiffs' distributor as a *quid pro quo* for the distributors' assistance in helping to procure engagements, and (f) failing to disclose the aforesaid to Plaintiffs.

## COUNT 6:
### FRAUD

31. Defendants made several material representations of fact, including, without limitation, the following: (a) that Defendants procured the engagements in question, (b) that Defendants did *not* procure the engagements in question, (c) that Goodfriend desired for Plaintiffs to assist him in the procurement of the engagements in question, and/or (d) that neither Goodfriend nor TAG "requested" that Plaintiffs and/or Phillips assist Goodfriend in procuring the engagements in question. One or more of these representations were false, and Defendants either knew they were false when made, or made the representations recklessly without knowledge of the truth thereof. Defendants intended for Plaintiffs to rely upon the representations by, *inter alia*, allowing Defendants to extract commissions for the engagements in question, and/or by inducing Plaintiffs to engage in conduct that could subsequently be construed as illegal under the Act. Plaintiffs relied on these representations, and were harmed when Defendants commissioned the engagements and/or when Defendants provided false

testimony before the California Labor Commission in an effort to benefit Goodfriend's current client, *Buckcherry*.

## VIII. KNOWING AND INTENTIONAL CONDUCT

32. Defendants had an actual awareness of the acts constituting breach of warranty, misrepresentation and unconscionability set forth in Counts 1 through 3 of this Petition in that Defendant Goodfriend knew that he was asking Plaintiffs to perform services which were characterized under the Act as "procurement," and knew that – unless he avowed that he requested the services – Plaintiffs' contractual rights would be in jeopardy. Furthermore, Goodfriend deliberately misrepresented the truth when he swore-out his declaration that "[n]either [he] nor [TAG} solicited, procured or negotiated" any of the engagements in question, and that he did not "request" that Plaintiffs procure any of those engagements. Finally, Defendants knowingly commissioned engagements that they later claimed not to have "solicited, procured or negotiated."

## IX. CAUSATION / DAMAGES

33. The conduct described above has been and is a producing and/or proximate cause of damages to Plaintiffs, including, without limitation: benefit of the bargain damages, reliance damages, out of pocket damages, mental anguish damages, and consequential damages (including the loss of contractual and intellectual property rights estimated to exceed $20 million). Moreover, the actions engaged in by each of the Defendants were wanton, malicious, and carried-out with the specific intent to cause substantial injury, rendering appropriate the award of punitive damages.

34. The amount of Plaintiffs' damages exceeds the minimum jurisdictional limits of the Court.

## X. CONDITIONS PRECEDENT

35. All conditions precedent have been performed or have occurred as required by Texas Rule of Civil Procedure 54.

## XI. DEMAND FOR JURY

36. Plaintiff demands a trial by jury and tenders the required fee.

## XI. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Todd Meagher respectfully requests that upon final trial and hearing of this matter, Plaintiff have the following against Defendant:

(a) Judgment for actual and mental anguish damages in an amount to be proven at trial, but which Plaintiff estimates to exceed $20 million;

(b) An award of treble damages under the DTPA;

(c) An award of exemplary damages.

(d) An award of pre- and post- judgment interest.

(e) An award of reasonable and necessary attorney's fees and costs of suit; and

(f)  Such other relief, both general and special, at law and in equity, to which Plaintiffs may show themselves justly entitled.

Dated this 6th day of October, 2010,

_____
R. Buck McKinney
Texas Bar # 00784572
**LAW OFFICE OF BUCK MCKINNEY**
PO Box 6231
Austin, Texas 78762-6231
Telephone: 512/236-0150
Fax: 512/444-1879


James E. Key
Texas Bar #24012958
**HARRIS, FINLEY & BOGLE, P.C.**
777 Main Street, Suite 3600
Fort Worth, Texas 76102
Telephone: 817/870-8735
Fax: 817/333-1182


**COUNSEL FOR PLAINTIFFS
TODD A. MEAGHER and MARILYN D.
GARNER, TRUSTEE TO THE BANKRUPTCY
ESTATE OF TODD ENTERTAINMENT, LLC**

# HARRIS·FINLEY·BOGLE

James E. Key
Direct 817.870.8735
Direct Fax 817.333.1182
jkey@hfblaw.com

October 7, 2010

**067 248 661 10**

Thomas A. Wilder
Tarrant County District Clerk
Tim Curry Criminal Justice Center
401 W. Belknap
Fort Worth, Texas 76196

VIA HAND DELIVERY

Re: *Todd A. Meagher and Marilyn D. Garner, Trustee for the Bankruptcy Estate of Todd Entertainment, LLC vs Andrew Goodfriend, an Individual and The Agency Group, Ltd., a California Corporation*

Dear Mr. Wilder:

Enclosed for filing is the original and four copies of Plaintiff's Original Petition in connection with the captioned matter. Please file the original and return the file marked copies to me via my awaiting courier.

Also enclosed is our firm check in the amount of $265.00 to cover your fee for filing and issuance of two citations. Once the citation has been issued, please call me at the above number and I will have it picked up and served by private process.

Thank you for your assistance in this matter. If you have any questions, please give me a call.

Yours truly,

James E. Key

JEK/dm
Enclosures
287397.1/5800.54   10/07/10 (Date)
sent a copy of letter
To Doc prod ____ (initials).

*FILED TARRANT COUNTY 2010 OCT -7 PH 3:58 THOMAS A. WILDER DISTRICT CLERK*

HARRIS, FINLEY & BOGLE, P.C. • 777 MAIN STREET SUITE 3600 • FORT WORTH, TEXAS 76102 • 817.870.8700 • HFBLAW.COM